J-S16028-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| JORDAN EDWARD DUVALL | : | |
| Appellant | : | No. 1549 WDA 2024 |

Appeal from the Judgment of Sentence Entered October 8, 2024
In the Court of Common Pleas of Bedford County Criminal Division at
No(s): CP-05-CR-0000474-2021

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| JORDAN EDWARD DUVALL | : | |
| Appellant | : | No. 1550 WDA 2024 |

Appeal from the Judgment of Sentence Entered October 9, 2024
In the Court of Common Pleas of Bedford County Criminal Division at
No(s): CP-05-CR-0000512-2021

BEFORE:  LAZARUS, P.J., BOWES, J., and LANE, J.

MEMORANDUM BY BOWES, J.:            **FILED: July 17, 2026**

Jordan Edward Duvall appeals from the aggregate judgment of sentence of sixteen to thirty-two years of incarceration imposed following his multiple convictions related to his driving a vehicle into a grocery store and attacking arresting officers.[1]  We affirm.

---

[1] This Court consolidated the cases *sua sponte*.

At approximately 4:00 p.m. on November 7, 2021, video surveillance captured Appellant arriving at the front of the closed Saxton Market. He proceeded to make a three-point turn in his Honda CRV onto the sidewalk, position his vehicle between the store's bollards, stop completely, and accelerate through the sliding-glass doors. Appellant braked once he was halfway through the then-shattered glass doors, but continued to speed through the entire vestibule. A bystander called 911 while a neighbor approached Appellant to coax him out of his car. Multiple other onlookers appeared on scene as Appellant refused to leave the store's entryway. He was gesticulating with his arms and appeared to be yelling. After several minutes of arguing with the bystanders, Appellant eventually exited and walked down the street.

Corporal Gary Ford, Jr., of the Pennsylvania State Police ("PSP") was the first member of law enforcement to arrive on scene. The crowd following Appellant pointed him out as the assailant and the corporal confirmed that he matched the description provided over the flash. Corporal Ford ordered Appellant to stop, but he continued walking. The corporal eventually brought Appellant to the ground with a taser. PSP Trooper Avery S. Deskevich arrived to assist with Appellant's arrest.

Once the troopers secured Appellant's wrists in handcuffs and guided him to Trooper Deskevich's patrol vehicle, Appellant threw his head at the trooper. They took him to the ground for a second time. Still struggling,

Appellant kicked the trooper in the shoulder. Corporal Ford eventually restrained Appellant's legs and forced him into the police vehicle. When the troopers tried to belt him into the seat, Appellant continuously thrusted his hips upwards to thwart their efforts. His active resistance was captured by the patrol vehicle's dash camera, as was his erratic and offensive speech that he yelled while officers took statements from witnesses. On the way to the barracks, Appellant also threatened to slit Trooper Deskevich's throat. Upon an inventory search of Appellant's vehicle, the trooper discovered a small blue bottle containing what he believed, in his professional experience, to be methamphetamine and two straws typically used to ingest the substance.

Appellant was charged with burglary, criminal trespass, and criminal mischief for the act of driving through Saxon Market, and aggravated assault, simple assault, terroristic threats, and resisting arrest for the incident with the troopers.[2] The matter proceeded to a jury trial wherein Appellant represented himself. The aforementioned facts were borne out by eyewitnesses and the responding law enforcement officers, and the jury viewed the surveillance and dashcam videos. Appellant testified in his defense and alleged that his car had poor brakes and rotors and that investigating officers failed to test the effectiveness of his vehicle's ability to stop. The jury convicted Appellant of

---

[2] Appellant was also charged with possession of drug paraphernalia and possession of a controlled substance, but those counts were ultimately *nolle prossed*.

all charges except terroristic threats; the court thereafter deferred sentencing to obtain a presentence investigation ("PSI") report.

Notably, during the lunch break of trial, the court learned that Appellant had left his pit bull in his car. The court directed Appellant to take the dog back home because he could be convicted that afternoon. Upon learning that Appellant ignored the court's prior directive to transport the dog, and having safety concerns, the court postponed revoking Appellant's bail and ordered him to turn himself in by noon the following day. Instead, Appellant absconded to New York and committed a firearms offense. He also posted purportedly violent messages on Facebook disparaging the legal justice system and threatening courthouse staff, leading to new, unrelated charges of terroristic threats.

Appellant was eventually returned to Pennsylvania for sentencing and was appointed counsel. In light of the new charges related to Appellant's social media posts, he requested that the trial judge, the Honorable Travis W. Livengood, P.J., recuse. He posited that it was likely that Judge Livengood would be called as a witness in the terroristic threats case and therefore could not be impartial during sentencing. Judge Livengood denied the request, doubting that he would be called as a witness since he did not interpret Appellant's threats to be personal. He also opined that because he was the judge who oversaw Appellant's trial, it was appropriate for him to issue the sentence.

The court proceeded to review the standard ranges of the sentencing guidelines for Appellant's convictions, noting his prior record score of one. The standard range for aggravated assault was six to fourteen months, with an aggravated range of fifteen to twenty months of incarceration. As to burglary, the standard range was one to twelve months, and the aggravated range was thirteen to fifteen months in prison. On criminal trespass, the standard range was restorative sanctions to nine months, with an aggravated range of ten to twelve months of incarceration. Finally, criminal mischief carried a standard range of one to twelve months, with an aggravated range of thirteen to fifteen months in prison. **See** N.T. Sentencing, 10/8/24, at 6 (pagination provided). Aggravated assault, burglary, and criminal trespass were graded as second-degree felonies with a maximum allowable sentence of ten years. **See** 18 Pa.C.S. § 1103.

The Commonwealth requested an aggregate term of three to fifteen years in a state correctional facility. Appellant, on the other hand, advocated for a county sentence of eleven and one-half to twenty-three months. He also declined to exercise his right to allocution. Judge Livengood then stated the following on the record:

> My overall view of [Appellant] is that - now, I understand I don't
> have a medical diagnosis or a mental health diagnosis specifically
> to support this, but in a lot of ways, he strikes me as what one
> would consider to be a sociopath. What I mean by that is that,
> his conduct has been shown to be one that he does not think that
> the norms of societal rules or the laws or any directives on how
> orderly society is supposed to function applies to him in anyway
> [*sic*]. So what I mean by that is this, the testimony at trial was

that when he arrived at the market the day of this incident, that he had a discussion with a gentleman that he wanted in the market and I believe that he either wanted dog food or pickles, I think was the testimony. But regardless, he wanted inside the market.

He was told that it wasn't open and I think he knew that it wasn't open. Nonetheless, he smashed his vehicle through the front doors of the market. And I know, counsel, you weren't here at the trial. Appellant insinuated that it was an accident in his questioning. That clearly is not true.

And in all my years as a judge, I don't think that I have seen a more intentional act captured on camera than the event of him going through the doors of this market. Because not only did he have to pull up to the doors, he had to -- and there's testimony that bores [*sic*] this out and the video that I saw at trial. He had to back up, position himself carefully through two bollards in order to get and smash into the doors. It is perhaps one of the most intentional acts criminal-wise to be caught on camera.

In addition to that, he not only smashed through the doors, but as the video bored [*sic*] out, he stopped, could have backed out at that point, but nonetheless, then hit the gas again and sped through the corridor. Now, I know the market was closed at that point, but he had no idea if there were workers in that corridor. He had no idea if there was anyone else that he could have killed that day and it really appeared that he did not care, because he did it in a - he sped through that corridor, the entryway of the market. He then proceeded to go out into Saxton after the incident, police arrive, it seemed to be a big commotion, both from the video and from the testimony at the trial. And obviously, the state troopers come to arrest him.

They attempt to place him under arrest. He attempts to headbutt and fight with the troopers. So that's the second time here that in this course of events where he's just decided not to follow any norms of society.

At the trial, he chose to represent himself and he would not listen to simple commands as to how the trial was to proceed. He was obstructive during the trial. I think the court tried to be as patient with him as we could. And then, on the last day of trial, as we were nearing completion of it, he informed me that he had brought

his dog and left the dog out in the car in the parking lot. I instructed him during that lunch break that he was to take that dog home, because we had no idea what the outcome of the trial would be. The dog shouldn't be out there by itself in the car. [It p]resented a safety issue for the dog, as well as anyone else in the parking lot and I told him to take him home. As we wound up that day, he was convicted of the verdict and he informed me that the dog was still out there. Yet again, that was another display of noncompliance that [Appellant] had.

At that point, I was left with the situation where, I believed him to be a danger to society, because of what I had seen on the video and his actions, and I revoked his bail. However, I did not know what to do with the dog, because I was informed it was -- I believe it was a pit bull. I was concerned again about the safety of the dog, trying to get the dog out of the car or any officer that would try to get the dog out of the car. And it appeared to be, at least I can kind of infer, that the dog was just brought so he wasn't going to jail that day.

So, I was left with that dilemma. So, I afforded [Appellant] the privilege of reporting the next day in order to save the dog, in essence. So, I gave him the next morning to report to jail. And after that directive, which was very clear to him, he fled the state. And not only did he flee the state, but he did so in a manner in which, this is now when I'll get into the social media posts, this is not in anyway a comment on him making any statements towards me, but he made very direct statements flouting the administration of law, the working of the justice system, after having been convicted by a jury of his peers of several felonies. So he not only fled the state and was a fugitive for a significant period of time, but after fleeing the state, he commits new crimes by possessing, I believe . . . in New York. The crimes that he committed, the firearm offenses that he committed fleeing this date in New York, he is convicted of those. They don't count as a prior record score, but he is convicted of those. So after disobeying the order of this court to report, just simply report the next day, after being convicted, he fled the state and committed other crimes in another state.

So I go over that long explanation of what I've seen from his conduct to this. When I have someone, that thinks that the law, the rules or any code of proper conduct that allows for an orderly and safe society to function, when I have someone that does not

think that those rules apply to them in anyway, which he's clearly shown by his conduct. He doesn't think any of those rules apply to him. Whether it be the law, the crimes code, my rules, anybody's, New York's.

So when you have someone that has a state of mind where they don't think any rules apply to them and that matches up with a clearly shown propensity to commit crimes that are – let's be honest, these aren't just property crimes, these are violent crimes, because again he demolished the doors of the Saxton Market with his own vehicle and then sped through the entryway and then assaulted a trooper thereafter. So these aren't just property crimes. They appear as burglary and criminal trespass, but these are the worst forms of burglary and criminal trespass that I've come across and, the most extreme ones, too. Not only in small towns such as Saxton, I'm sure that town relies upon that market.

So his conduct not only impacted an individual victim, being the market, it impacted that community as a whole, because I'm sure that community couldn't use that market for a period of time, given what he had done. So this isn't a burglary or a trespass where it's simply one person trying to get into another person's home or another person's business in order to steal some money and then the only damage or the only break in is a lock on a door. This is the most extreme burglary that you can imagine or that I've seen, because it demolished the entire front of the store and the working order of that store, and then [a]ffected the entire community being able to use a food market.

So when I look at the three factors that I'm supposed to sentence on here, the protection of the public, the gravity of the offense and the rehabilitative needs, his rehabilitative needs are very serious. I know he has a series of mental health needs. I know that's some of what's going on here, but in the same right, he has not attempted to get control of that and I don't know to what degree. I know there's prior drug use here too, but he hasn't gotten control of that and that has resulted in violent and destructive and, like I said, sociopathic behavior.

The gravity of the offense. I just spoke on that these offenses were very intentional. There's no way either of these, any of these criminal episodes are accidental. They are intentional. It damaged a public space. This wasn't on a private individual's

home. So the range of effect the crimes had were wide felt towards the community. And again, like I said, the extent of the burglary and trespass crimes are of a degree that are higher than I usually see. For example, the trespass wasn't simply - it would have been trespass for him to simply walk into that store without it being open. He smashed through - he smashed into the doors. The burglary is complete at that time. The trespass is then when he drives an entire vehicle through the rest of the store at a high rate of speed. That makes those crimes more serious than your normal burglary or trespass case.

And then, lastly, the protection of the public. He has demonstrated over and over and over on several occasions here his noncompliance with any directives. His noncompliance with the law and it is absolutely clear to me that he is going to -- well, he tried to hurt the state trooper in this case. He certainly could have hurt or killed someone in the market. But just by his very conduct, he is – he's making it very clear, he's speaking as loudly as he can by his conduct that he is a danger, clear and present danger to the public.

So, I am going to depart from the guidelines here and I am going to impose maximum sentences on a lot of these cases. They are going to be running consecutive, because I believe that that is the least amount of jail time necessary to achieve the three goals in sentencing that I've just gone through. Because I just do not think that the guidelines take into account the seriousness of these offenses, the gravity of these offenses, the necess[it]y to protect the public from his conduct and his rehabilitative needs.

N.T. Sentencing, 10/8/24, at 10-17 (cleaned up).

The court then imposed consecutive sentences of five to ten years of incarceration each for aggravated assault, burglary, and criminal trespass, and one to two years for criminal mischief, amounting to an aggregate term of sixteen to thirty-two years in prison.[3] Appellant submitted a post-sentence

---

[3] The remaining offenses merged for sentencing purposes.

motion seeking reconsideration of his sentence and a new trial based upon the weight of the evidence. He also renewed his request for Judge Livengood to recuse. After oral argument, the court denied the motion.

Appellant timely appealed and the court ordered a statement pursuant to Pa.R.A.P. 1925(b).[4] Appellant complied, and the court authored a responsive Rule 1925(a) opinion. He presents the following questions for our consideration, which we have reordered for ease of disposition:

> 1. Whether the trial court abused its discretion when it denied Appellant's motion for new trial based on the weight of the evidence, inasmuch as the verdicts were so contrary to the evidence as to shock the sense of justice and so that the right may be given another opportunity to prevail?
>
> 2. Whether the sentencing court abused its discretion when it sentenced Appellant to an aggravated term of imprisonment of [sixteen] years to [thirty-two] years, imposed consecutively and outside the aggravated range of sentence, without an adequate basis for such departures, and doing so while fixating on the gravity of the offenses and ignoring other factors, resulting in an unreasonable sentence?

---

[4] We remind the trial court that all Rule 1925 orders must list "both the place the appellant can serve the Statement in person and the address to which the appellant can mail the Statement." Pa.R.A.P. 1925(b)(3)(iii).

Appellant also filed an application to proceed *pro se* in this Court. Upon remand for a hearing in accordance with **Commonwealth v. Grazier**, 713 A.2d 81 (Pa. 1988), the trial court found that Appellant wished to continue to be represented by appeal counsel. A day later, however, the trial court received a *pro se* filing from Appellant seeking new counsel. The trial court informed this Court of the letter, but nevertheless opined that Appellant's choice to be represented by appeal counsel remained a knowing and voluntary choice.

3.     Whether the trial court abused his discretion when, after a timely filed motion to recuse, denied said motion claiming that he could sentence Appellant in a fair and impartial manner?

Appellant's brief at 7 (cleaned up).

We begin with Appellant's weight challenge, for which the following principles apply:

When a trial court considers a motion for a new trial based upon a weight of the evidence claim, the trial court may award relief only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. The inquiry is not the same for an appellate court. Rather, when an appellate court reviews a weight claim, the court is reviewing the exercise of discretion by the trial court, not the underlying question of whether the verdict was against the weight of the evidence. The appellate court reviews a weight claim using an abuse of discretion standard.

*Commonwealth v. Rivera*, 238 A.3d 482, 497-98 (Pa.Super. 2020). We have explained that "an abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Santos*, 176 A.3d 877, 882 (Pa.Super. 2017) (cleaned up).

In Appellant's view, the court abused its discretion in denying his motion for a new trial where "there [wa]s no testimony from the Commonwealth to show that Appellant's vehicle was in working order at the time of the accident. In other words, accidents happen and to assume that Appellant committed a crime without additional evidence is against the weight of the evidence."

Appellant's brief at 25. He contends that there was "not a shred of evidence" to prove that he had any intent to commit a crime once he drove into the market, failing to establish an element of burglary. *Id*. Appellant further argues that the dashcam videos fail to depict any violence inflicted on the PSP troopers, which falls short of a conviction for aggravated assault. *Id*.

The trial court explained its conclusion that the jury's verdict did not shock its "sense of justice" thusly:

> A simple review of the video evidence is enough to defeat [Appellant]'s challenge to the weight of the evidence. [Appellant] intentionally drove his vehicle through the foyer of the Saxton Market, destroying much of the property, and then attempted to head-butt a state trooper. The video evidence is not only determinative of this issue raised by [Appellant], it is overwhelming.

Trial Court Opinion, 4/9/25, at 5.

We fail to discern a misapplication of the law, or decision-making based upon bias, partiality, or ill-will. It was within the province of the jury, who watched the surveillance and dashcam footage, to assess the credibility of the witnesses and Appellant's defense. His argument that the court abused its discretion in denying his motion for a new trial is therefore without merit.

To the extent Appellant avers that the evidence was inadequate to support his convictions, that is a challenge to the sufficiency, not weight, of the evidence. *See Commonwealth v. Arias*, 286 A.3d 341, 349 (Pa.Super. 2022) (specifying that a sufficiency argument "asserts that there is insufficient evidence to support at least one material element of the crime for which [the

a]ppellant has been convicted"). As he has failed to preserve such claims in his Rule 1925(b) statement, those challenges are waived.[5] **See**, **e.g.**, Pa.R.A.P. 1925(a)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").

We turn to Appellant's assertion that his sentence was unreasonable. For this Court to reach the merits of a challenge to the discretionary aspects of sentencing, we must initially determine:

> (1) whether appellant has filed a timely notice of appeal; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence; (3) whether appellant's brief has a fatal defect [pursuant to] Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code.

**Commonwealth v. Lucky**, 229 A.3d 657, 663-64 (Pa.Super. 2020) (cleaned up).

Appellant satisfied the first three requirements by timely appealing, filing a post-trial motion to reconsider his sentence, and including a Rule 2119(f) statement in his brief. As to whether he raised a substantial question, Appellant avers that the sentencing court imposed "minimum terms that are at or above the aggravated range recommended by the guidelines, which was

---

[5] Although the court's Rule 1925(b) order failed to list both the place where Appellant could serve his statement in person and the address to which he could mail the statement, it specified that any issue not included in the statement will be deemed waived.

- 13 -

done without an objectively reasonable basis, rendering the resulting sentence excessive." Appellant's brief at 13. He maintains that the sentencing court "compounded the excessive[ness] of the sentence[s] outside of the guidelines" by ordering them to run consecutively "and so warehoused [Appellant] without any meaningful consideration of the factors at 42 Pa.C.S. § 9721(b)." *Id*. Appellant has thus raised a substantial question. *See Commonwealth v. Verma*, 334 A.3d 941, 945-46 (Pa.Super. 2025) (holding that a claim asserting "that the trial court failed to properly consider mitigating factors and imposed an unreasonable sentence by sentencing Appellant above the standard range of the sentencing guidelines" presented a substantial question). Having satisfied the aforementioned four-part test, we proceed to the merits of Appellant's contention.

It is well established that "sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." *Commonwealth v. Wallace*, 244 A.3d 1261, 1278 (Pa.Super. 2021) (cleaned up). A court must impose a sentence "that is consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S. § 9721(b). The sentencing court is afforded great deference because it is "in the best position to determine the proper penalty for a particular

offense based upon an evaluation of the individual circumstances before it."
***Wallace***, 244 A.3d at 1279 (citation omitted).

Although a court must consider the guidelines when crafting a sentence, they are "purely advisory in nature." ***Commonwealth v. Baker***, 311 A.3d 12, 19 (Pa.Super. 2024) (citation omitted). Accordingly, a sentencing court may "use its discretion and sentence defendants outside the guidelines, as long as the sentence does not exceed the maximum sentence allowed by statute." ***Id***. (cleaned up). The court must also provide "the reasons for doing so on the record." ***Id***. (cleaned up). In sum, we have explained:

> When reviewing a sentence outside of the guidelines, the essential question is whether the sentence imposed is reasonable, considering the nature and circumstances of the offense, the history and characteristics of the defendant, the opportunity of the sentencing court to observe the defendant, including any [PSI report], the findings upon which the sentence was based, and the sentencing guidelines.

***Wallace***, 244 A.3d at 1279 (cleaned up).

As a general matter, "the court has discretion whether to make [a sentence] concurrent with or consecutive to other sentences then being imposed or other sentences previously imposed." ***Commonwealth v. Morrobel***, 311 A.3d 1153, 1157 (Pa.Super. 2024) (cleaned up). Finally, where the court has ordered and reviewed a PSI report, "it is presumed that the court [wa]s aware of all appropriate sentencing factors and considerations." ***Commonwealth v. Torres***, 303 A.3d 1058, 1065 (Pa.Super. 2023) (cleaned up).

Appellant argues that "[t]he sentence imposed is in derogation of any evidence relating to Appellant's rehabilitative needs and the other facts at § 9721(b)." Appellant's brief at 19 (citation altered). The court, Appellant asserts, only acknowledged the portion of the PSI report that stated that he had posted threats on Facebook to courthouse staff. *Id*. at 20. It otherwise ignored that Appellant was college educated and had never received drug and alcohol counseling. *Id*. He posits that "a reading of the trial transcript coupled with Appellant's behavior clearly reflects on an unaddressed mental health issue." *Id*. The court was angered by Appellant's failure to show up after his bail was revoked, which he claims was unwarranted where he "was punished in the [s]tate of New York for said decision by facing new charges, and then was extradited back to Pennsylvania to face the [c]ourt." *Id*. at 22.

Appellant likens his case to ***Commonwealth v. Williams***, 69 A.3d 735 (Pa.Super. 2013), wherein this Court vacated Williams's excessive sentence of a maximum of sixty-eight years in prison for burglary and simple assault and remanded for resentencing. Specifically, we concluded that the record demonstrated that the sentencing judge was biased and actively advocated against Williams where the judge: (1) expressed annoyance with the prior trial judge's decisions granting Williams leniency; (2) noted that she was "the most violent, thuggish female who has appeared" before the judge; (3) repeatedly questioned Williams and witnesses on her pattern of robbing Catholic churches with a motive that was unsupported by the record; and (4) used pseudo-

medical terminology claiming Williams was a "pathological liar" and "classic sociopath" without evidence of a mental health condition. *Id*. at 748-49. Here, Appellant asserts that Judge Livengood displayed bias against him where he referred to Appellant as a sociopath and claimed that his trial testimony was false. *See* Appellant's brief at 22.

In its Rule 1925(a) opinion, the court summarized that:

> [Appellant]'s actions during the incidents of which he was convicted, his actions during trial, and his actions after trial demonstrated that he is a clear and present danger to public safety, that he refuses to adhere to basic societal norms, and that he is strongly resistant to any means of rehabilitation. After careful consideration of the gravity of the offense, the protection of the public, and the rehabilitative needs of [Appellant], we believed the imposed sentence to be the minimal amount of incarceration necessary to further those criteria.

Trial Court Opinion, 4/9/25, at 2-3. It also urged this Court to watch the video exhibits, which it opined

> clearly shows [Appellant] intentionally and deliberately line up his vehicle between protective bollards in order to smash through the market's doors. After doing so, [Appellant] accelerates at a high speed through the vestibule of the market for complete disregard for the safety of anyone who could have been working inside. . . . While [Appellant] is certainly entitled to testify in his defense, the court may also consider his false testimony insofar as it affects his chances at rehabilitation, or resistance thereto.

*Id*. at 3. The court further noted that it had the benefit of Appellant's PSI report prior to sentencing. *Id*. at 2.

Upon review, we cannot say that the court abused its discretion in sentencing Appellant above the guidelines. The court's contemporaneous explanation at the sentencing hearing, detailed hereinabove, exemplifies that

it considered a wide range of circumstances when imposing Appellant's sentence, and balanced the factors outlined in § 9721(b). **See** N.T. Sentencing, 10/8/24, at 10-17. Unlike the court in **Williams**, Judge Livengood did not advocate against Appellant throughout the proceedings, but rather thoroughly explained his reasoning for the upward deviation from the guidelines and his decision to order the sentences consecutively. Although Judge Livengood acknowledged that Appellant was not medically diagnosed as a sociopath, he clarified that the term was used to describe Appellant's repeated failure to follow his directives and conform to society, which is supported by the record. The surveillance and dashcam footage, which this Court has reviewed, support Judge Livengood's description of the pertinent events and his characterization of Appellant's actions as deliberate. Accordingly, the record reflects that the sentence the court imposed was reasonable, given the nature of Appellant's offenses, his conduct before and following his convictions, and Judge Livengood's observations. No relief is due.

We finally address Appellant's assertion that the court abused its discretion in denying the motion to recuse.

> It is well-settled that where a jurist rules that he can hear and dispose of a case fairly and without prejudice, that decision will not be overturned on appeal but for an abuse of discretion.
>
> In reviewing the denial of a recusal motion to determine whether the judge abused his discretion, we recognize that our judges are honorable, fair, and competent. Based upon this premise, where a judge has refused to recuse himself, on appeal, we place the

burden on the party requesting recusal to establish that the judge abused his discretion.

*Commonwealth v. Freeman*, 351 A.3d 284, 289 (Pa.Super. 2026) (cleaned up). Further, if a judge determines that he can be impartial, "the judge must then decide whether his or her continued involvement in the case creates an appearance of impropriety and/or would tend to undermine public confidence in the judiciary. This is a personal and unreviewable decision that only the jurist can make." *Commonwealth v. Kane*, 188 A.3d 1217, 1225–26 (Pa.Super. 2018) (cleaned up).

Appellant assails Judge Livengood's decision not to recuse when Appellant had posted purportedly threatening statements on social media after he fled to New York. *See* Appellant's brief at 26. He acknowledges that he failed to enter the social media posts as exhibits when he argued his motion. *Id*. at 27 n.4. Nevertheless, he contends that Judge Livengood "did not place on the record why he thought he could act impartially and without prejudice. He merely indicated that he was not a witness or a victim, as the President Judge, in the alleged Facebook threats." *Id*. at 27.

The trial court refers us to the reasoning it placed on the record at the outset of Appellant's sentencing hearing. *See* Trial Court Opinion, 4/9/25, at 4. Therein, Judge Livengood explained that the social media posts were only attached to Appellant's PSI report to demonstrate the length of time he had been a fugitive in New York, and he did not interpret the messages as threats to him. *See* N.T. Sentencing, 10/8/24, at 3. Judge Livengood did not believe

- 19 -

that he was a victim and thus did not think it was plausible that he would be called as a witness in the terroristic threats case. *Id*. He further clarified that he was "not going to let anything [Appellant] said about [him] post trial [a]ffect [his] sentencing decision[.]" *Id*. at 4.

The court's rationale fails to display an abuse of discretion. Appellant has the burden to prove that Judge Livengood's decision was based upon improper considerations, which he did not. Further, he neglected to include the relevant social media posts in the record. Without any proof to support his bald assertion that Judge Livengood improperly remained the sentencing judge despite the posts, Appellant has fallen short of his burden.

Overall, Appellant has failed to demonstrate that the trial court abused its discretion in denying his motion for a new trial, in crafting his sentence, and in denying the motion to recuse. Therefore, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

7/17/2026